**COLORADO STATE BOARD OF MEDICAL EXAMINERS,** Complainant–Appellee,

v.

**Roger Woods DAVIS, Respondent– Appellant.**

No. 93CA0911.

Colorado Court of Appeals, Div. III.

March 9, 1995.

---

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Andrew D. Stone, Asst. Atty. Gen., Denver, for complainant-appellee.

Montgomery Little & McGrew, P.C., David A. Burlage, Christopher B. Little, Englewood, for respondent-appellant.

Opinion by Judge DAVIDSON.

Respondent, Roger Woods Davis, appeals from the order of the Colorado State Board of Medical Examiners (Board) revoking his license to practice medicine. We affirm.

Respondent first became addicted to drugs in the late 1960s during his medical residency when, suffering from a sleep disorder, he began self-administration of sodium pentothal, a barbiturate, taken from an anesthesia preparation room. He continued this practice on a regular basis for nearly three years until his use of barbiturates was discovered and he was taken by police to a hospital and detoxified.

After two subsequent hospitalizations for depression, respondent resigned his residency and entered private practice in Utah. Although he did not obtain medical attention for his continuing sleep disorder, he sought relief by use of tranquilizers, antihistamines, and muscle relaxants.

In 1975, respondent began chronic use of the narcotic Demerol in connection with the sleep ailment. In March 1975, after learning that he had been reported to the Utah medical licensing authority, he took an accidental overdose of Valium, Benadryl, and morphine, and again was hospitalized.

The licensing authority, after disciplinary hearing, found that respondent's self-administration of this drug overdose impaired his ability to practice medicine, and that respondent had repeatedly treated patients for nonexistent fractures and had accepted insurance payments for such treatments.

Consequently, respondent's medical license was placed on probation for a minimum of five years conditioned on monthly psychiatrist visits and random urine screening for narcotics.

In 1979, the Utah licensing authority revoked respondent's medical license after finding that respondent had improperly prescribed Demerol for himself, had intercepted Demerol intended for patient use, and had stolen sodium pentothal from a hospital operating room. This revocation, however, was stayed on condition that respondent surrender his federal and state narcotics licenses, that he be prohibited from prescribing controlled substances, that he submit to quarterly psychiatric reports, and that he limit his practice to group or instructional physical and rehabilitative medicine.

In 1984, upon stipulation that respondent had improperly and excessively used sodium pentothal, barbiturates, and Demerol, the Colorado Board of Medical Examiners granted him a three-year probationary license. Respondent successfully completed this probationary period.

As part of his rehabilitative and pain management practice, respondent performed cryoanalgesia, a procedure which freezes nerves with liquid nitrogen. Respondent learned this technique by reviewing articles and manufacturers' videotapes. In an information sheet prepared for distribution to patients, however, he professed to have learned the procedure at the Mayo Clinic in Rochester, Minnesota.

During cryoanalgesic procedures, respondent administered intramuscular injections of Demerol to his patients. He obtained the Demerol from a hospital pharmacy and kept it in a locked drawer in his office desk.

Early in January 1991, respondent began using Demerol again. By keeping inadequate records of the Demerol used on patients, he diverted enough of the drug that, by the third week of February 1991, he was injecting himself daily.

Colorado Springs police detectives first contacted respondent on February 4, 1991, in connection with an investigation into excessive prescriptions of Ritalin obtained by one of respondent's patients. When they questioned the large volume of Demerol prescriptions in respondent's pharmacy records, respondent indicated that he was allergic to the drug and denied using it himself.

On February 15, 1991, respondent asked a patient to help him obtain some Demerol, allegedly to replace some that was missing from his office. He later instructed the patient to retrieve some Demerol prescriptions

from his home mailbox which he indicated would be split between the patient and himself. The patient, accompanied by police officers, filled the prescriptions and placed respondent's portion of the Demerol in his mailbox. Respondent was then arrested.

In a later hearing before an Administrative Law Judge (ALJ), it was determined that the Demerol which was to be retained by the patient via this scheme was not related to her medical needs. It was further determined that respondent's prescription of Demerol to this patient had aggravated her chemical dependence and withdrawal symptoms.

At or about the same time as the mailbox incident, respondent entered an inpatient drug treatment program. While in a subsequent outpatient program, respondent continued to use Demerol on several occasions. After these charges were filed against him by the Board, respondent entered an inpatient recovery program in Atlanta, Georgia, designed specifically to treat health care professionals.

After hearing, the ALJ issued a comprehensive 66–page initial decision which was adopted by the Board. The ALJ concluded that respondent had engaged in acts of unprofessional conduct in violation of the Colorado Medical Practice Act (MPA), § 12–36–101, et seq., C.R.S. (1991 Repl.Vol. 5B), as follows: (1) excessive use of a habit forming drug or controlled substance; (2) multiple incidents of administering, dispensing, or prescribing habit forming drugs or controlled substances other than in the course of legitimate professional practice; (3) prescribing, distributing, and self-administering a schedule II controlled substance; (4) engaging in misleading, deceptive, or false advertising; (5) multiple acts or omissions which failed to meet generally accepted standards of medical practice; and (6) a *nolo contendere* plea to a felony drug charge.

Accordingly, the ALJ recommended to the Board that it revoke respondent's license. Respondent filed exceptions to the ALJ's findings and recommendations. After oral argument before the hearings panel, the Board adopted all of the ALJ's findings of fact and conclusions of law and revoked re-

spondent's medical license. This appeal followed.

I.

Americans with Disabilities Act

██ Although respondent does not dispute that he suffers from a chemical addiction problem, he argues that his chemical dependency qualifies as a disability under the federal Americans with Disabilities Act (ADA). Respondent maintains that he was not using drugs illegally at the time of the hearing, and that he is entitled to the protection of the ADA because of his status as an addict in recovery. Under the circumstances, we do not agree that the ADA protects respondent from license revocation.

██ The ADA prohibits employment-related discrimination by a public entity against qualified individuals with disabilities. 42 U.S.C. § 12131, et seq. (1993 Supp.). Addiction is a disability according to the ADA; consequently, the ADA may provide protection to addicted individuals. This protection, however, does not extend to an individual who is currently engaging in the illegal use of drugs, including narcotics, regardless of the user's state of addiction to the drugs. *See* 28 C.F.R. § 35.131 (1994).

██ Current illegal use of drugs includes uses "that occurred recently enough to justify a reasonable belief that a person's drug use is current or that continuing use is a real and ongoing problem." *See* 28 C.F.R. § 35.131, App. A at 454 (1994). Thus, contrary to respondent's contentions, under the ADA, there need not be actual illegal use of drugs at the time of the disciplinary hearing or other employment-related action in order to find that an individual does not qualify as a person with a disability because of a "current illegal use of drugs."

Although the record reveals no illegal drug use by respondent since July 1991, his history of recurrent illegal drug use, the risks of relapse, and his relatively short period of recovery support the ALJ's finding that "continuing [drug] use is a real and ongoing problem" for respondent.

This court is bound by agency fact findings and conclusions of law if supported by substantial evidence in the record. *See Arteaga v. Industrial Claim Appeals Office,* 781 P.2d 98 (Colo.App.1989). Substantial evidence is that which is probative, credible, and competent, such that it warrants a reasonable belief in the existence of a particular fact without regard to contradictory testimony or inference. *Allen Co. v. Industrial Commission,* 762 P.2d 677 (Colo.1988).

Whether there is substantial record evidence to support an agency's decision is a question of law and the reviewing court must examine the record in the light most favorable to that decision. *Colorado State Board of Nursing v. Lang,* 842 P.2d 1383 (Colo.App. 1992). The agency, and not the reviewing court, is charged with weighing the evidence and resolving any conflicts. *Board of Assessment Appeals v. Colorado Arlberg Club,* 762 P.2d 146 (Colo.1988).

Here, because the record reveals sufficient competent evidence to warrant a reasonable belief that respondent's illegal use of drugs was a real and ongoing problem, we will not disturb the decision. *See Atchison, Topeka & Santa Fe Ry. Co. v. Public Utilities Commission,* 763 P.2d 1037 (Colo.1988); *Goodwill Industries v. Industrial Claim Appeals Office,* 862 P.2d 1042 (Colo.App.1993).

Furthermore, contrary to respondent's contention, the absence of any evidence that he was using drugs illegally at the time of the hearing is not relevant to a finding that he had violated the MPA. The section of the MPA which the ALJ found that respondent had violated defines "unprofessional conduct" as "excessive use of any habit-forming drug ... or any controlled substance." *See* 12–36–117(1)(i), C.R.S. (1991 Repl.Vol. 5B). It does not require current addiction or use of drugs at the time of the disciplinary hearing. *Compare Colorado State Board of Nursing v. Crickenberger,* 757 P.2d 1167, 1168 (Colo.App.1988) (statutory authority under which nurse was sanctioned required a finding that the license holder "*[i]s* addicted to or dependent on alcohol") (emphasis is original) *with Hall v. Colorado State Board of Medical Examiners,* 876 P.2d 77 (Colo.App.1994) (interpreting Medical Practice Act).

## II.

### False Advertising

Respondent next argues that the Board erred as a matter of law in concluding that an information sheet for patients entitled, "Fact Sheet on Cryoanalgesia," was false advertising, and thus unprofessional conduct within the meaning of Colo. Sess. Laws 1979, ch. 108 § 12–36–117(1)(q) at 512, (repealed Colo. Sess. Laws 1991, ch. 161 at 884), as then in effect. We disagree.

In her findings of fact, later affirmed and adopted by the Board, the ALJ found that respondent's "Fact Sheet" met the definition of "advertisement" contained within the Colorado Consumer Protection Act. *See* § 6–1–102, C.R.S. (1992 Repl.Vol. 2) (" 'Advertisement' includes the attempt by publication, dissemination, solicitation, or circulation, visual, oral, or written, to induce directly or indirectly any person to enter into any obligation or to acquire any title or interest in any property.").

The ALJ further relied upon the definition of "advertise" as meaning "[n]otice given in a manner designed to attract public attention" and "[i]nformation communicated to the public, or to an individual concerned, as by handbills, newspaper, television, billboards, [or] radio." *See Black's Law Dictionary* 50 (5th Ed.1979).

Noting that neither "advertisement" nor "advertise" is defined by the MPA, the ALJ concluded that, because respondent's "Fact Sheet" was disseminated and circulated as an attempt to induce patients to undergo cryoanalgesia, at least indirectly if not directly, and because it was a handbill which communicated information to patients, the "Fact Sheet" was advertising within the meaning of § 12–36–117(1)(q). Specifically, the ALJ found that the "Fact Sheet" was "informative advertising," giving "information about the suitability and quality of products." *See Black's Law Dictionary* 50 (5th Ed.1979).

### A.

The MPA was amended in 1991 to add an expanded prohibition against false, fraudulent, misleading, or deceptive communications and advertising. *See* § 12–36–128.5, C.R.S. (1991 Repl.Vol. 5B). Relying upon § 12–36–128.5(1)(c), C.R.S. (1991 Repl. Vol. 5B) of the amended statute, respondent contends that the purpose of this prohibition is to prevent public dissemination of false or misleading advertising by means of "television, radio, motion pictures, newspapers, books, or lists or directories of physicians." Because the "Fact Sheet," does not fall into one of these categories, he argues, it is not "advertising" as contemplated by the MPA. We disagree for several reasons.

First, § 12–36–128.5(1)(c) was not in effect at the time respondent was charged with false advertising under the Medical Practices Act. Respondent's conduct in connection with the "Fact Sheet" is governed by § 12–36–117(1)(q), which prohibits as "unprofessional conduct," any "[a]dvertising which is misleading, deceptive, or false."

Second, even if we assume that we should look to § 12–36–128.5(1)(c) for guidance in determining what is or is not advertising, by its plain terms, the statute only purports to define "public communication," as used in § 12–36–128.5(2), C.R.S. (1991 Repl.Vol. 5B). The term "advertising" remains undefined.

Third, even if "public communication" under the Medical Practices Act, is read as synonymous with "advertising," the definition of "public communication" cited by respondent is inclusive of, but expressly "not limited to, communication by means of television, radio, motion pictures, newspapers, books, or lists or directories of physicians." *See* § 12–36–128.5(1)(c). We perceive no reason why printed material distributed to patients within a physician's office should be *per se* excluded from the definition of "public communication."

### B.

Nonetheless, respondent asserts that the "Fact Sheet" may be read simply as a private discussion intended merely to inform patients of the potential benefits and risks of the cryoanalgesic procedure. Therefore, he contends, as a whole it was not intended to be "advertising" in the strict sense of the word. We disagree.

The particular statement which the Board found to be false fits the definition of advertising. "Advertising" means "[a]ny oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business." *Black's Law Dictionary* 50 (5th Ed.1979).

Here, the "Fact Sheet" was made available to respondent's patients and contained a false statement linking respondent to a nationally known and respected medical institution. As such, it was likely to induce a patient to undergo cryoanalgesia. A purely impartial, factual description of the procedure for information purposes would not necessarily include this assertion.

Furthermore, we agree with the Board that a fair reading of the false statement leads to the conclusion that it was intended to induce patients to be treated by respondent. We do not view as dispositive the fact that the "Fact Sheet" was not distributed to the public at large. It is sufficient that it was intended to communicate to concerned individuals information about respondent's "product," the cryoanalgesic procedure. *See Black's Law Dictionary* 50 (5th Ed.1979).

### C.

Respondent also contends that there was no evidence in the record to support the claim of false advertising because the only patient who testified that she received the "Fact Sheet" prior to undergoing cryoanalgesia indicated that she did not rely upon the "Fact Sheet" in deciding to have the procedure performed. We are not persuaded.

Section 12–36–117(1)(q), as then in effect, does not require that actual reliance on the part of any patient or member of the public must be proven before the Board can find that unprofessional conduct by false advertising occurred.

Nonetheless, respondent again urges us to look to § 12–36–128.5 for guidance. He contends that the definition of false advertising

contained in § 12–36–128.5 is similar to civil fraud and notes that, to prove fraud, there must be reasonable reliance upon a material misrepresentation.

■ Section 12–36–128.5, however, does not require proof of actual reliance. According to § 12–36–128.5(2):

No physician shall disseminate or cause to be disseminated any public communication which contains a false, fraudulent, misleading, or deceptive statement or claim and which is intended to or likely to induce, directly or indirectly, the rendering of professional services or furnishing of products in connection with the physician's practice of medicine.

■ By the plain terms of this statute, if the false statement was either intended or likely to induce a patient to engage the physician's services, it is a violation of the MPA regardless of any actual reliance by any patient upon that statement. Consequently, whether respondent's patient did or did not rely upon the "Fact Sheet" when deciding to undergo the procedure is immaterial to the Board's finding that respondent engaged in unprofessional conduct by false advertising.

### III.

Respondent next contends that certain factual findings by the ALJ are not supported by the record. We disagree.

### A.

■ First, respondent maintains that the Board erroneously adopted the ALJ's finding that he had received appropriate diagnosis or treatment prior to enrolling in the Atlanta program. To the contrary, our review of the record reveals hospitalization, diagnosis, and treatment, specifically related to chemical dependency, on at least four occasions. The record further reveals that respondent admitted to several of his treating doctors and nurses that he knew he had a chemical abuse problem.

### B.

■ Similarly, we reject respondent's contention that the ALJ's finding of Demerol

diversion for his own use was unsupported by the record.

At the hearing, respondent testified that he had prescribed 300 mg. of Demerol for a patient on January 24, 1991. He testified that he then administered only 100 to 150 mg. of that prescription to the patient and admitted that he did not know if the Demerol he administered to himself later that day was the remainder of that prescription. He indicated that he did not know whether "she got the first dose" or he "got the first dose." He then agreed that he diverted Demerol from his patients but found it difficult to say how often, from which patient, and in what amount the diversions occurred.

Respondent's own admissions constitute substantial evidence of Demerol diversion, and therefore, we will not disturb the ALJ's findings or conclusions on review. *See Colorado State Board of Nursing v. Lang, supra.*

### C.

■ Finally, respondent contends that the ALJ's finding that his patient care fell below generally accepted medical standards is not supported by substantial evidence in the record. Again we disagree.

The ALJ concluded that respondent's patient care fell below generally accepted standards of medical practice when he prescribed Demerol for a patient's use by home injection. Respondent contends that the record supports his opinion that unusual circumstances dictated the prescription.

According to expert testimony in the record, however, although under highly unusual circumstances a limited quantity of Demerol for home injection is an appropriate prescription, no such circumstances justified the prescription here.

The ALJ also found that respondent's prescriptions to two other patients fell below acceptable standards. Respondent contends that he was "duped" by these patients, both substance abusers, into prescribing unnecessary medications and that the record does not support the conclusion that this constituted substandard practice.

An expert testified, however, that respondent's prescription of unnecessary medication to the two other patients was substandard because it was excessive and harmful to the patients regardless of their deceptions. Both of these patients had been subsequently hospitalized in connection with habitual drug use.

Although respondent presented conflicting testimony on these patient care issues, the ALJ resolved these matters against him. The ALJ had the task of weighing the testimony and resolving the conflicting evidence, and, as her findings are supported by substantial evidence in the record, they will stand on review. *See Cary v. Chevron U.S.A., Inc.,* 867 P.2d 117 (Colo.App.1993).

The order revoking respondent's license to practice medicine is affirmed.

HUME and JONES, JJ., concur.