**CITY OF LOVELAND POLICE DEPARTMENT and CIRSA, Petitioners,**

v.

**INDUSTRIAL CLAIM APPEALS OFFICE of the STATE OF COLORADO, Lana Lea Davison, and David Allan Davison, deceased, Respondents.**

No. 05CA0165.

Colorado Court of Appeals, Div. II.

May 18, 2006.

Certiorari Denied Sept. 11, 2006.

Nathan, Bremer, Dumm & Myers, P.C., Anne Smith Myers, Allison R. Ailer, Denver, Colorado, for Petitioners.

No Appearance for Respondent Industrial Claim Appeals Office.

Law Offices of Jan A. Larsen, P.C., Jan A. Larsen, Fort Collins, Colorado, for Respondents Lana Lea Davison and David Allan Davison, Deceased.

ROTHENBERG, J.

In this workers' compensation proceeding, City of Loveland Police Department and its insurer, CIRSA (collectively employer), seek review of a final order of the Industrial Claim Appeals Office (Panel) awarding death benefits to Lana Lea Davison, the widow of David Allan Davison. Because we conclude there is sufficient evidence in the record to satisfy the requirements of § 8–41–301(2)(a), C.R.S.2005, which permits a claim for death benefits to be based on mental impairment, we affirm.

## I. Background

This case has a lengthy history. David Allan Davison was a captain in the Loveland Police Department for many years until he committed suicide in 1996. During the time he worked for the department, he was one of two captains employed there. The captains had different assignments and duties. A few months before his death, Captain Davison was assigned to the Services Division, where he was responsible for certain disciplinary actions.

Two hearings were held before an administrative law judge (ALJ) in October 1998 and January 1999. According to the testimony presented, Captain Davison had been suffering from depression for four to five years, and in the two years leading up to his death, he also experienced a number of unfortunate personal and professional events, including the unexpected death of his younger brother in 1994 and Mrs. Davison's diagnosis of a serious illness in 1995. However, there was testimony that Captain Davison's stress increased dramatically on or about April 4, 1996, when a newspaper reporter informed him and his supervisor, Chief of Police Tom Wagoner, that several officers had engaged in sexual acts with prostitutes while conducting a sting operation regarding a prostitution ring. According to the testimony of Chief Wagoner, this was highly irregular activity by the officers which had been done without his or Captain Davison's knowledge or approval. Furthermore, the officers claimed their actions were at the request of the local prosecutor. The officers had fully disclosed these activities in their reports, which apparently were discovered by the media.

The officers' conduct during the sting operation attracted a significant amount of me-

dia attention and criticism of the department. On April 11, 1996, Chief Wagoner gave Captain Davison the sole responsibility of disciplining the officers involved in the sting operation. Chief Wagoner testified that after he told Captain Davison he was to handle the discipline process alone, Captain Davison broke down and cried. According to Chief Wagoner, this was highly unusual behavior for Captain Davison. Captain Davison was so upset that Chief Wagoner responded by agreeing to share the responsibility.

Captain Davison committed suicide on April 16, 1996, leaving behind a note that described the causes and extent of his depression.

After the suicide, Mrs. Davison filed the claim for workers' compensation benefits at issue here, which employer contested. She maintained that her husband's psychological injury and resulting suicide were caused by job-related stress and were compensable under § 8–41–301(2)(a), which permits a claim to be based on mental impairment. Under the statute, "mental impairment" means

> a recognized, permanent disability arising from an accidental injury arising out of and in the course of employment when the accidental injury involves no physical injury and consists of a psychologically traumatic event that is generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances.

Section 8–41–301(2)(a).

At the hearings, Mrs. Davison presented the testimony of Dr. Robert David Miller, a professor in charge of the forensic psychiatry program at the Health Sciences Center. He was also an adjunct professor of law at the University of Denver College of Law, a director of research of forensics at the state hospital in Pueblo, and was certified by the American Board of Forensic Psychiatry, the American Board of Psychiatry and Neurology in general psychiatry, and the American Board of Psychiatry and Neurology in forensic psychiatry.

Dr. Miller testified that Captain Davison had been suffering from depression resulting from a combination of job pressures, which had been building over four to five years. Dr. Miller expressed his opinion, however, that the precipitating and chief factor in the development of Captain Davison's depression was the stress caused by his employment.

Employer presented the testimony of Dr. Richard Vandenberg, a psychiatrist who had been in private practice for approximately thirty years. Dr. Vandenberg taught and supervised residents at the University of Colorado Health Sciences Center, was board eligible in psychiatry, and was recognized as a "Life Fellow" by the American Psychiatic Society. He expressed the opinion that Captain Davison's death was caused by biological changes resulting from "a serious underlying depression." He stated that by the time of the suicide, "external events wouldn't be nearly as important" as biological changes resulting from the untreated depression.

The ALJ denied Mrs. Davison's claim in March 1999, after finding that Captain Davison's depression and death were not related to his employment. The ALJ made no findings regarding the other requirements of the statute.

In May 2000, the Panel remanded the case for entry of a new order because it concluded "the evidence does not support the ALJ's finding that [Dr. Vandenberg] opined [Captain Davison's] depression 'was not precipitated by his employment.'" The Panel explained:

> At most, Dr. Vandenberg opined that [Captain Davison's] depression immediately preceding the suicide was caused by brain chemistry, not the circumstances of employment. However, Dr. Vandenberg rendered no opinion concerning whether or not [Captain Davison's] employment was a precipitating factor in the claimant's *initial* period of depression. Furthermore, the record contains some evidence which would support an inference that the claimant's depression was precipitated by his employment.

When the case was remanded, the original ALJ had retired and was replaced by another ALJ, who examined the record and entered a second order in May 2001. In that order, the ALJ observed that both psychiatrists "agreed that it was Captain Davison's depressive disorder which [led] to his sui-

cide." The ALJ also discussed the differences in their opinions:

Dr. Vandenberg testified that, in people with major depressive disorder, the precipitating event that can be found is usually found in the first episode when they get depressed; that depression is biological .... A major depressive disorder can be caused by stress. Dr. Vandenberg did not, however, give an opinion as to the initial cause or stresses of Captain Davison's depression and he did not state that stresses of Captain Davison's job were not the initial cause of his depression.

In contrast, Dr. Miller gave the opinion that Captain Davison's initial depression was caused by the stresses of his work at the [Loveland Police Department]. The ALJ credits this opinion. Captain Davison's depression was precipitated four to five years before his death, well before his brother's death in 1994 and ... the diagnosis of his wife's illness [in] 1995.

The ALJ found that "[w]hile there were other factors in play, Captain Davison's depression arose primarily from his occupation and his place of employment." The ALJ concluded his death was compensable and awarded death benefits to Mrs. Davison.

Employer appealed, and in October 2001, the Panel set aside the order and remanded for a second time. The Panel concluded that the ALJ had not applied the appropriate legal standard because she had not determined "whether the allegedly traumatic events were beyond [Captain Davison's] usual experiences as a police captain" and "whether a 'reasonable worker' performing work similar to that of the decedent would have experienced 'significant symptoms of distress' when confronting the allegedly traumatic events." The Panel instructed the ALJ to determine "whether these elements of proof are supported by the testimony of a licensed physician or psychologist."

In December 2001, the ALJ entered a third order, again awarding death benefits to Mrs. Davison. In this order, the ALJ specifically addressed the elements required by § 8–41–301(2)(a) and found that (1) while other factors were involved, Captain Davison's depression was principally caused by job stress; (2) the job pressures he faced were unique and outside a police captain's usual experience; and (3) they would evoke significant symptoms of distress in a similarly situated police captain.

Employer appealed again, and in an order dated April 9, 2002, the Panel reversed the award of death benefits. The Panel rejected Mrs. Davison's contention that expert testimony was not required to prove all elements of the statute. The essence of the Panel's decision was that Mrs. Davison had failed to produce expert testimony from a " 'licensed physician or psychologist' to 'support' findings that the alleged psychologically traumatic events were outside 'a worker's usual experience' and would evoke 'significant symptoms of distress in a worker in similar circumstances.' "

Mrs. Davison appealed, and a division of this court affirmed the Panel's decision to set aside the order awarding Mrs. Davison workers' compensation benefits. *Davison v. Indus. Claim Appeals Office,* 72 P.3d 389, 391 (Colo.App.2003)(*Davison I* ).

Mrs. Davison then appealed to the Colorado Supreme Court, contending the Panel and the division in *Davison I* had erred in their interpretation of § 8–41–301(2)(a) and in their holding that expert testimony was required to prove all the statutory elements.

The supreme court agreed, reversed *Davison I,* and clarified the requirements of the statute. *Davison v. Indus. Claim Appeals Office,* 84 P.3d 1023 (Colo.2004)(*Davison II* ). The supreme court held that when a claimant seeks workers' compensation benefits under § 8–41–301(2)(a), "[e]xpert testimony is necessary to prove that the event was psychologically traumatic, but the other elements can be proved by" lay testimony, expert testimony, or a combination of the two. *Davison II, supra,* 84 P.3d at 1033.

The court clarified, however, that a claimant such as Mrs. Davison was still required to meet her burden under § 8–41–301(2)(a), if not through expert testimony, then through other competent evidence, of proving a psychologically traumatic event that is generally outside the employee's usual experience and would evoke significant symptoms of distress in a similarly situated worker. *Davison II, supra,* 84 P.3d at 1032–33.

The supreme court remanded the case to the court of appeals with instructions to return it "to the ICAO to rehear the claims" so that Mrs. Davison could have "the opportunity to present new evidence in accordance with [the court's] decision, but also so that the ALJ may evaluate the evidence already presented by [Mrs. Davison] to prove the elements of the statute." *Davison II, supra,* 84 P.3d at 1032 n. 7, 1033.

On April 28, 2004, the Panel remanded to the ALJ for further proceedings consistent with *Davison II*. On remand, both Mrs. Davison and employer filed status certificates expressly stating that no additional testimony or hearing time was required. Hence, the ALJ issued a procedural order finding that "further hearing testimony or additional evidence [was] not necessary" and that a decision could be rendered based on the evidentiary record before the ALJ. The procedural order permitted written argument regarding the new standard announced in *Davison II*. Neither party has asserted in this appeal that the ALJ's failure to conduct a hearing following the remand by the supreme court was error.

After reviewing the parties' submissions and reexamining the record, the ALJ entered a fourth order on August 24, 2004, again awarding death benefits to Mrs. Davison. Relying on the testimony of Dr. Miller, the ALJ found:

> Captain Davison's depression was principally caused by the stress of his job at the [Loveland Police Department] consisting of multiple psychologically traumatic events. Captain Davison had an extraordinary work load. He had to deal with some extraordinary personnel problems. The multiple psychologically traumatic events to which Captain Davison was subjected were unique, outside a police captain's usual experience, and would evoke significant symptoms of distress in a police captain in similar circumstances.

The ALJ found the psychologically traumatic events that caused Captain Davison's mental impairment were "proximately caused by hazards to which he was not equally exposed outside of his employment with the [Loveland Police Department]" and rejected employer's alternative argument that, under § 8–41–301(2)(b), C.R.S.2005, Mrs. Davison was limited to twelve weeks of benefits.

On January 5, 2005, the Panel affirmed the ALJ's fourth order in a detailed order that addressed and rejected the sufficiency of evidence arguments employer raises in this appeal. The Panel also set forth the history of this case, including its reasons for reversing the first ALJ's order and issuing the first remand order:

> Our May 2000 Order of Remand determined that a previous ALJ's order dated March 1, 1999, was erroneous because it found that [Dr. Vandenberg] opined the decedent's depression "was not precipitated by his employment." Instead, we conclude[d] that [Dr. Vandenberg] opined the suicide was not precipitated by the employment, but offered no opinion concerning the original cause or causes of the underlying depression. We then remanded the matter for "a new order concerning the compensability of the claim," and stated that we should "not be understood as expressing any opinions concerning the proper resolution of the underlying factual issues . . . .

The Panel discussed the scope of its first remand order and rejected employer's contention that the second ALJ was not authorized to make new findings of fact:

> [T]he May 2000 order constituted a "general remand" which authorized the ALJ to reconsider all of the evidence and enter new findings consistent with the views expressed in our order. Thus, we authorized the ALJ to make entirely new findings concerning the cause of the decedent's depression and suicide, and did not limit the ALJ to considering only those potential causes which occurred in 1991 or 1992.

The Panel then expressed its understanding of the supreme court's remand order in *Davison II* and determined that the second ALJ had acted in accordance with it:

> [T]the ALJ's August 2004 order was entered pursuant to the Supreme Court's opinion, which also constitutes a general remand. The Supreme Court's order authorized the ALJ to "rehear" the case and remanded "for further proceedings consistent with this opinion." In our view, the

Supreme Court's decision constitutes law of the case and the ALJ acted consistently with the Supreme Court's order when entering the new findings.

Finally, the Panel addressed and rejected employer's contention that the evidence was insufficient to support the ALJ's fourth order:

The [employer's] primary contention is that Finding of Fact 45 is not supported by substantial evidence to the extent the ALJ found the decedent experienced "multiple psychologically traumatic events" which were outside a police captain's usual experience and would evoke significant symptoms of distress in a police captain in similar circumstances." Indeed [employer states] the order does not describe the evidence on which this finding is based, and the respondents can "find no evidence in the record to support these findings." The respondents also challenge Finding of Fact 41.

[W]e have no difficulty ascertaining the underlying basis for Finding of Fact 45. The ALJ explicitly found that the decedent's job as a police captain in the operations division involved two primary sources of unusual stress including an extraordinary workload and the discipline of police officers who engaged in conduct which was embarrassing to the department. (Finding of Fact 40–42)

[T]here is substantial evidence to support these findings. As the ALJ found, after the decedent's death the City created three division chiefs to handle the work previously managed by two. Chief Wagoner testified that he told a newspaper reporter that people "couldn't comprehend" the pressure the decedent was under as a division commander and the department "works its people too hard." Chief Wagoner told another reporter the decedent was under "tremendous stress" and was the "hardest working person" the chief knew. Dr. Miller ascribed the decedent's stress to "increased responsibilities" and increased "administrative duties in a growing police force." While there is some evidence which would permit a contrary[inference], the ALJ plausibly inferred from this record that the claimant was expected to perform even more duties than the usual police captain and that he experienced pressures in excess of those ordinarily experienced by a police captain.

[T]he ALJ plausibly inferred from the creation of a third captain's position ... that there was sufficient work for three captains although the same amount of work was previously handled by two. It is logical to infer from this evidence the decedent was performing substantially more work than the usual police captain.

[T]he ALJ reasonably inferred that a police captain in circumstances similar to those of the decedent would have experienced significant symptoms of distress. The chief's statements concerning the amount of stress placed on commanders and the amount of work required are persuasive in this regard. This inference is also supported by statements contained in notes left behind by the decedent.

[T]he evidence supports the ALJ's findings concerning the effects of the decedent's duties as a disciplinary officer. The decedent was responsible for participating in or conducting due process hearings when an officer was potentially subject to serious discipline. In 1991 or 1992 the decedent was required to conduct a hearing involving an officer romantically involved with a high school student. The claimant described how the decedent was required to perform an unusual amount of work on the case and was disturbed by the ultimate results of the process and its effects on the image of the department. The decedent would also have been required to participate in the disciplinary proceedings involving the faulty and highly publicized prostitution sting. Chief Wagoner described this type of disciplinary proceeding as unpleasant and of sufficient emotional impact to cause him personal distress. Indeed, Chief Wagoner stated that he was "shocked and angered" upon learning of officers' conduct during the prostitution sting.

[T]he ALJ was persuaded that officer conduct involving actual or potential public embarrassment was relatively unusual as evidenced by the high degree of procedural protections afforded the affected officer

[and] that these types of proceedings were of sufficient emotional impact to cause distress to even the highest ranking officer. While other inferences might have been drawn, we may not substitute our judgment for that of the ALJ on these factual issues.

(Citations omitted.)

Employer now appeals the Panel's January 2005 order, contending that the record does not support the ALJ's findings of fact and conclusions and that the Panel erred in upholding the ALJ's order. We disagree.

## II. Standard of Review

■ Initially, we address the standard of review we are required to apply in resolving employer's arguments. *See Davison II, supra,* 84 P.3d at 1029. We emphasize that the scope of our review of an ALJ's decision in a workers' compensation action is "exceedingly narrow." *Metro Moving & Storage Co. v. Gussert,* 914 P.2d 411, 414 (Colo.App.1995).

■ We review the ALJ's conclusions of law de novo. *See Colo. Dep't of Labor & Employment v. Esser,* 30 P.3d 189 (Colo. 2001). However, by statute, both the Panel and reviewing courts must apply the substantial evidence test in determining whether the evidence supports the ALJ's findings of fact. Section 8–43–308, C.R.S.2005; *Cordova v. Indus. Claim Appeals Office,* 55 P.3d 186 (Colo. App.2002).

■ Whether there is substantial evidence to support an agency's decision is a question of law, but, in applying the substantial evidence test, we must view the evidence as a whole and in the light most favorable to the prevailing party. *Indus. Comm'n v. Royal Indem. Co.,* 124 Colo. 210, 236 P.2d 293 (1951). We must also defer to the ALJ's credibility determinations and resolution of conflicts in the evidence, including the medical evidence. If two equally plausible inferences may be drawn from the evidence, we may not substitute our judgment for that of the ALJ. *Gelco Courier v. Indus. Comm'n,* 702 P.2d 295 (Colo.App.1985).

■ Substantial evidence is that which is probative, credible, and competent, such that it warrants a reasonable belief in the existence of a particular fact without regard to contradictory testimony or inference. *Allen*

*Co. v. Indus. Comm'n,* 762 P.2d 677 (Colo. 1988); *Colo. State Bd. of Med. Exam'rs v. Davis,* 893 P.2d 1365 (Colo.App.1995).

We are also mindful of the supreme court's conclusion in *Bodaghi v. Department of Natural Resources,* 995 P.2d 288, 303 (Colo. 2000), that "the court of appeals erred in parsing through the record and testimony presented and making its own findings of fact in lieu of those made by the ALJ." The court there reiterated the standard of review:

The findings of an administrative tribunal as to the facts shall be conclusive if supported by substantial evidence. Even when evidence is conflicting, the hearing officer's findings are binding on appeal, and a reviewing court may not substitute its judgment for that of the factfinder. An agency's factual determination reasonably supported by the record is entitled to deference.

The credibility of witnesses and the weight to be accorded their testimony lies within the province of the agency as trier of the facts. Where the record supports the findings of the factfinder, the court of appeals is not at liberty to make an independent evaluation of the evidence and substitute its judgment for that of the factfinder.... "When a conflict in the evidence exists, it is not within the power of a reviewing court to substitute its judgment for that of the fact finding authority as to the weight of the evidence and the credibility of witnesses."

*Bodaghi v. Dep't of Natural Res., supra,* 995 P.2d at 303 (citations omitted; quoting *Goldy v. Henry,* 166 Colo. 401, 408, 443 P.2d 994, 997 (1968)).

We examine the record before us with those admonitions in mind.

## III. Employer's Contentions

Employer raises several contentions regarding the requirements of compensability for mental impairment under § 8–41–301(2)(a). We reject each argument in turn.

### A.

■ Employer first contends there was insufficient evidence that Captain Davison's

mental impairment was work related and that there was a nexus between the impairment and his employment. We disagree.

One of the requirements of the first clause of the mental impairment statute, § 8–41–301(2)(a), is that the injury must arise out of the course and scope of the claimant's employment. This element is required in all workers' compensation claims, including those involving physical injury.

■ In determining whether an injury arose out of the course of employment, courts must examine the totality of the circumstances to evaluate whether there is a sufficient nexus between the employment and the injury. *Davison II, supra,* 84 P.3d at 1032.

In Captain Davison's suicide note, which was admitted into evidence, he referred to work pressures dating back four to five years, and the ALJ was free to consider the weight to be given this and other evidence. *See Wilson v. Indus. Claim Appeals Office,* 81 P.3d 1117 (Colo.App.2003).

Employer contends the letter was self-serving and incompetent evidence, and also relies on testimony by Dr. Miller that Captain Davison was unable realistically to assess events in his life just before his suicide. However, employer has taken Dr. Miller's testimony out of context and has also failed to take into account the totality of the evidence, which showed that while the stress dated back several years, Captain Davison was able to perform his job well until shortly before his suicide, and that the stressful events in his life "culminated" in the work stress caused by the prostitution sting and the intense media attention resulting from it. This evidence could be considered by the ALJ as part of the totality of the evidence supporting the nexus between Captain Davison's impairment and his employment. *See Davison II, supra.*

We conclude the evidence, while conflicting, is sufficient to support the ALJ's finding that Captain Davison's depression was principally caused by the stress of his job.

### B.

■ Employer next contends there was no expert testimony proving the personnel issues and workload pressures were "psychologically traumatic," as required by the supreme court in *Davison II.* Again, we disagree.

The issue in *Davison II* was whether expert testimony was needed to prove *all* the elements of mental impairment. The supreme court held that expert testimony is necessary only to prove that an event was psychologically traumatic and that the other elements of § 8–41–301(2)(a) can be proved by lay testimony, expert testimony, or a combination thereof.

In arguing for reversal, employer relies heavily upon the findings of fact and conclusions of law in the Panel's April 9, 2002 order. There, the Panel concluded Mrs. Davison had failed to provide expert testimony establishing that Captain Davison had experienced psychologically traumatic events which were outside a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances.

However, after *Davison II* was announced, the Panel recognized that it had applied an incorrect legal standard in its April 2002 order and that the case had been remanded so the Panel and the ALJ could consider the claim under the newly announced legal standard. Therefore, it is not surprising that when the Panel reviewed the ALJ's fourth order and applied *Davison II,* the Panel reached a different conclusion in its January 2005 order.

Employer also argues that Dr. Miller's opinion was insufficient to show there was a "psychologically traumatic event" which preceded Captain Davison's death. We disagree.

■ Nothing in *Davison II* requires the expert to use this exact statutory term when testifying to the circumstances surrounding the event. What is required is the presentation of sufficient facts such that the ALJ can find there existed a psychologically traumatic event or events. *See McCallum v. Dana's Housekeeping,* 940 P.2d 1022 (Colo.App.1996)(concluding § 8–41–301(2) applies when stress-related mental impairments are caused by multiple traumatic events).

Dr. Miller testified that, in forming his opinion, he relied on Captain Davison's written statements, including his suicide note. Dr. Miller also had conversations with Mrs. Davison, their daughters, and Chief Wagoner. Dr. Miller testified that Captain Davison's depression started several years before his death and his depression was "very consistent with the kinds of pressures that a job with increased responsibilities, increased administrative duties in a growing police force would be expected to have on such a person."

Dr. Miller observed that throughout this period of depression, Captain Davison "functioned on the job ... [and] at home, ... [and he] was not significantly impaired in any of his life activities" *before* the sting operation. It was Dr. Miller's opinion that "the reason [Captain Davison was] contemplating suicide [was] because of the job pressures which had been building over an extended four-five-year period, and *had culminated after the revelation of the sting operation and made his life unbearable, and he did not feel that he could go on.*" (Emphasis added.) Dr. Miller testified that "*it [was] abundantly clear that the chief factor [in Captain Davison's suicide], beyond any question, was, in fact, the job pressures and the subsequent revelations in the newspapers about the police officers crossing the line.*" (Emphasis added.)

Dr. Miller's testimony regarding Captain Davison's ability to function on the job until early 1996 was corroborated by the fact that Chief Wagoner had assigned him the sole responsibility of disciplining the officers in the sting operation, and that Captain Davison had just received a community award naming him officer of the year, which recognized his outstanding contributions as a member of the police department. And Chief Wagoner testified that the sting operation "was the straw that broke the camel's back" in terms of stress.

The ALJ's finding that a "psychologically traumatic event" led to Captain Davison's suicide is also supported by Dr. Miller's testimony that (1) no specific event initially caused Captain Davison's depression; (2) his depression was consistent with the kinds of pressures typically associated with the position of police captain; (3) he was able to function normally in spite of his depression prior to the sting operation; (4) the sting operation was the culmination of Captain Davison's depression; and (5) he committed suicide only five days after Chief Wagoner assigned him the responsibility of disciplining the officers involved in the sting operation.

As to employer's suggestion that Captain Davison's suicide was motivated by a desire to provide financial security for his wife, Dr. Miller testified otherwise. He stated that, although Captain Davison was aware workers' compensation benefits could potentially result from his suicide, it was very unlikely that he would have defrauded the workers' compensation program. Dr. Miller formed this opinion after considering Captain Davison's reputation in the community for honesty and integrity and the severity of his depression. Mrs. Davison also testified that they had no particular money problems.

Thus, while there was conflicting testimony, we conclude that Dr. Miller's testimony— viewed as a whole—is sufficient to support the ALJ's finding that the January 5 sting operation was a "psychologically traumatic event" that precipitated Captain Davison's suicide.

## C.

Employer next contends there was insufficient evidence to prove that the issues Captain Davison faced were unique and outside a police captain's usual experience. We are not persuaded.

The ALJ found that Captain Davison's job as a police captain involved unusual stress because he was responsible for the discipline of police officers who had engaged in unauthorized and highly publicized conduct that was extremely embarrassing to the department and was performed without his or Chief Wagoner's knowledge. The ALJ also referred to Captain Davison's extraordinary workload as a police captain.

These findings are supported by evidence of (1) Chief Wagoner's statements to the media and his testimony at the hearing regarding the level of stress involved in Captain Davison's position, (2) the intense media scrutiny surrounding the prostitution sting, and (3) evidence that after Captain Davison's

death, the police department increased the number of police captains.

The ALJ could reasonably infer from this evidence that Captain Davison was expected to perform more duties than the usual police captain, and that when the sting operation occurred, he experienced pressures exceeding those ordinarily experienced by similarly situated police captains. *See Davison II, supra,* 84 P.3d at 1031 (ALJ's factual findings are binding on appeal if they are supported by substantial evidence or plausible inferences from the record). Accordingly, we conclude there was sufficient evidence to support the ALJ's factual finding that Captain Davison's experiences were unique and outside a police captain's usual experience.

### D.

■ Employer next contends there was no evidence showing a similarly situated police captain would have sustained significant symptoms of distress from the problems that Captain Davison faced at the police department. We disagree.

In *Davison II,* the supreme court stated that the record in this case contains "some evidence to prove the event was generally outside a worker's experience and would evoke significant symptoms of distress in a similarly situated worker" because "Chief Tom Wagoner testified that the demands on Captain Davison would have caused Wagoner to experience significant stress." *Davison II, supra,* 84 P.3d at 1032 n. 7.

On remand, the ALJ made a similar factual determination. Relying on Chief Wagoner's testimony that he would find the personnel problems stressful, the ALJ found that the stress experienced by Captain Davison was significant and would evoke significant symptoms of distress in a similarly situated worker. We agree with the Panel that under the applicable standard of review, this factual finding may not be disturbed. *See Davison II, supra,* 84 P.3d at 1031.

In arguing that Chief Wagoner's testimony was insufficient, employer suggests that Mrs. Davison was required to show that other similarly situated police captains would have been driven to suicide, had they faced the circumstances that Captain Davison faced. Taking employer's argument to its logical conclusion, no dependent could ever receive an award of benefits for a work-related suicide because the vast majority of similarly situated persons would never commit suicide, no matter what provocation or stress they might face.

■ We do not read the statute so narrowly, nor are we permitted to parse the record and make our own findings of fact "in lieu of those made by the ALJ." *Bodaghi v. Dep't of Natural Res., supra,* 995 P.2d at 303.

■ The legislative purpose in enacting the statute was to establish the requirements for compensability of a stress-related claim, and it was designed to prevent frivolous claims. *Davison II, supra,* 84 P.3d at 1029–30; *Tomsha v. City of Colorado Springs,* 856 P.2d 13 (Colo.App.1992); House Floor Debate on S.B. 22, 55th General Assembly, 2d Regular Session (Apr. 10, 1986) (tape recording).

■ The statute discourages such claims by requiring a claimant to prove the employee experienced a psychologically traumatic event which, viewed objectively, was severe enough in nature to evoke significant symptoms of distress in a worker in similar circumstances. *See Davison II, supra,* 84 P.3d at 1028 n. 5. The General Assembly focused on the objective nature of the psychological event and its potential to evoke a significant reaction in similarly situated employees.

Thus, a compensable psychologically traumatic event under § 8–41–301(2)(a) must cause a significant, but not necessarily identical, reaction in similarly situated employees. Individual reactions of employees experiencing the same psychologically traumatic event will vary dramatically depending upon the physical and psychological makeup and resilience of the individuals affected.

■ Claimants such as Mrs. Davison are required to show that the employee upon whom they were dependent experienced a "psychologically traumatic event" or events arising during his or her employment that were "generally outside of the worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances." Section 8–41–301(2)(a).

But such claimants need not show the psychologically traumatic event would cause identical significant symptoms of distress in similarly situated workers. The ALJ found, with record support, that Mrs. Davison made that required showing here.

We therefore reject employer's contentions that there is insufficient evidence in the record to support the award of death benefits to Mrs. Davison and that the Panel erred in determining otherwise.

## IV. Limitation of Benefits

Employer next contends that even if Mrs. Davison is entitled to an award of benefits, the ALJ erred in awarding her death benefits pursuant to § 8–42–114, C.R.S.2005, and related statutes. According to employer, any compensability due to her should be analyzed under § 8–41–301(2)(b), and her award of benefits should also be made under that section. Employer thus argues that her award of benefits should have been limited to twelve weeks of medical impairment benefits. We disagree.

We review the interpretation of this section and the Workers' Compensation Act (Act) de novo. *See Wolford v. Pinnacol Assurance*, 107 P.3d 947, 950 (Colo.2005). We give deference to the agency's interpretation of the Act, but we are not bound by it. *Lobato v. Indus. Claim Appeals Office*, 105 P.3d 220, 223 (Colo.2005).

The purpose of statutory construction is to effectuate the legislative intent. To this end, words and phrases in a statute should be given their plain and ordinary meanings. The Act should also be read as a whole and construed harmoniously to give sensible effect to all its parts. *See Anderson v. Longmont Toyota, Inc.*, 102 P.3d 323 (Colo.2004). Further, when the General Assembly enacts legislation in an area, it is presumed to be aware of relevant judicial precedents and to have approved judicial construction of a statute if the provision remains unchanged. *Renaissance Salon v. Indus. Claim Appeals Office*, 994 P.2d 447 (Colo.App.1999).

Section 8–41–301(2)(b) provides that "where a claim is by reason of mental impairment, the claimant shall be limited to twelve weeks of medical impairment benefits," which is "inclusive of any temporary disability benefits." *City of Thornton v. Replogle*, 888 P.2d 782 (Colo.1995); *Dillard v. Indus. Claim Appeals Office*, 121 P.3d 301 (Colo.App.2005)(*cert. granted* Oct. 17, 2005). The limitation does not apply to a victim of a crime of violence, physical injury, or occupational disease that causes neurological brain damage. Section 8–41–301(2)(b).

Here, the ALJ and the Panel concluded that § 8–41–301(2)(b) has no relevance to the issue of death benefits, and the plain language of the statute does not support the construction urged by employer because § 8–41–301(2)(b) creates a limitation on permanent partial disability (PPD) benefits and contains no reference to death benefits. The Panel reasoned that, when § 8–41–301(2)(b) was enacted, the General Assembly was fully aware of the right to death benefits provided by § 8–42–114, and presumably was aware of the longstanding "rule of independence." Under that rule, death benefits provided to dependents, and wage loss and disability benefits provided to an injured worker, are considered to create distinct rights and compensate for separate losses. *See Cooper v. Indus. Claim Appeals Office*, 109 P.3d 1056 (Colo.App.2005).

Section 8–41–301(2)(b) makes no reference to death benefits, but creates a limitation on "medical impairment benefits." Medical impairment benefits represent a class of PPD benefits which compensate an injured employee for permanent disability under the scheme established by § 8–42–107, C.R.S. 2005. *City of Thornton v. Replogle, supra; Waymire v. Indus. Claim Appeals Office*, 924 P.2d 1168 (Colo.App.1996).

Furthermore, accrued and unpaid PPD benefits are not payable to dependents except where a claimant reaches maximum medical improvement before death. Thus, the right to PPD benefits accrues to the claimant before the death. *See* § 8–41–503(2), C.R.S.2005; *Nunnally v. Wal–Mart Stores, Inc.*, 943 P.2d 26 (Colo.App.1996).

The legislature has been explicit in imposing limitations on death benefits. *See, e.g.,* § 8–42–114 (creating an offset for Social Security death benefits). If it intended to limit death benefits where the death results from mental impairment, we conclude it would

have done so expressly. *Cf. City of Thornton v. Replogle, supra* (if the legislature wished to impose a twelve-week limitation on temporary disability benefits in addition to PPD benefits, it would have expressly done so).

We agree with the Panel that a consistent and harmonious reading of the Act does not support employer's argument that the legislature intended to limit dependents to twelve weeks of PPD benefits. Death benefits are distinct from PPD benefits, and the limitation on medical impairment benefits applies to those cases in which PPD benefits are payable to an eligible claimant, not to cases like this one in which a claimant seeks death benefits based on dependency.

The order of the Panel is affirmed.

Judge NEY * concurs.

Judge GRAHAM concurs in part and dissents in part.

Judge GRAHAM concurring in part and dissenting in part.

While I concur in the statutory interpretation contained in Part IV of the majority opinion, I disagree with the conclusion that an award of benefits was proper. I would remand for a new evidentiary hearing.

I dissent because I discern no substantial evidence in the record which would meet the burden of proving compensable mental impairment under § 8–41–301(2)(a), C.R.S.2005. The two clauses of that section require that in cases of mental impairment, a claimant show that he or she suffered "a recognized, permanent disability ... arising out of and in the course of employment" and that such mental impairment was caused by a "psychologically traumatic event that is generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances." Section 8–41–301(2)(a).

Here, the claimant satisfied, with expert testimony, the requirement of showing that the disability arose out of and in the course of employment. However, she was also required to show that there was a psychologi-

cally traumatic event which caused Captain Davison to commit suicide, that such event was outside a policeman's usual work experience, and that the event would have caused significant symptoms of distress in another worker under similar circumstances. These factors need not be established by expert testimony. *Davison v. Indus. Claim Appeals Office*, 84 P.3d 1023 (Colo.2004) (*Davison II*). *Davison II* held that an "expert must establish that the claimant has a recognized, permanent disability resulting from a psychologically traumatic event," but other competent evidence, including nonexpert or expert testimony, may be used to prove that the injury was work related, was generally outside the worker's usual experience or would evoke significant distress in a similarly situated worker. *Davison II, supra*, 84 P.3d at 1026.

A review of the procedural history in this case is necessary to place *Davison II* in focus.

In a May 2000 order of remand, the Panel concluded that the evidence presented at the original hearing held in October 1998 and January 1999 did not support the ALJ's findings, conclusions, and award of benefits. The Panel therefore remanded the case for further findings and conclusions.

Rather than take additional evidence, a new ALJ (replacing the first ALJ, who had retired) simply edited the first ALJ's findings of fact and conclusions of law by striking a few words and by making some additions, without citation to the record. The additions to the findings were as follows:

- No. 40 was amended to include: "The work load borne by Captain Davison was extraordinary as evidenced by the fact that following his death additional divisions were created, each headed by a captain."
- No. 41 was amended by adding "operations Commander" to identify Captain Davison; by adding "unique" to the phrase, "multiple personnel problems"; and by adding to one unidentified personnel problem involving a seventeen-

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2005.

year-old girl, the sentence: "Another case involved officers engaging in sex acts with prostitutes."

- No. 42 was added to the findings. It states: The personnel problems faced by Captain Davison were extraordinary because they became an embarrassing matter of public interest and involved police misconduct violative of the public trust. These personnel issues did not involve ordinary, run of the mill personnel problems such as excessive absenteeism or poor performance."
- No. 45(e) was amended to add: "Captain Davison had an extraordinary work load at LPD." Also, the paragraph was amended to state, "This was *not* a case of an idiosyncratic response to a non-stressful or mildly stressful occurrence easily tolerated by others similarly situated."

The conclusions of law were amended as follows:

- No. 3(d) was amended by adding: "This is *not* a case of an idiosyncratic response to a non-stressful or mildly stressful occurrence easily tolerated by others similarly situated."
- No. 3(e) was amended by adding: "Captain Davison had an extraordinary work load. He had to deal with some extraordinary personnel problems."

Not one of these additions was based upon new evidence adduced at a new hearing. Instead, they were added by a new ALJ reading a cold record and crediting the testimony of Dr. Miller as supportive of them.

The Panel reversed this modified order on April 19, 2002. In reversing for the second time, the Panel applied § 8–41–301(2)(a), ruled that expert testimony was required to prove both prongs of that statute, and concluded that no expert testimony supported a finding that the claimant had met her burden of proving that Captain Davison suffered a psychologically traumatic event which was outside a worker's usual experience and was such that it would evoke significant symptoms of distress in a worker in similar circumstances.

In its April 2002 order, the Panel stated:

In support of these conclusions, the ALJ credited the testimony of the claimant's psychiatric expert, Dr. Miller. Specifical-

ly, the ALJ credited Dr. Miller's opinion that the decedent's stress commenced four to five years before death and was associated with the stresses of his employment.

. . . .

We have carefully reviewed the testimony of Dr. Miller . . . . Clearly, Dr. Miller opined the decedent experienced depression, and ultimately committed suicide, as a result of psychological pressures which he experienced at work during a four to five year period. However, we are unable to locate any portion of Dr. Miller's testimony in which he opined the events experienced by the decedent were likely to "evoke significant symptoms of distress in a worker in similar circumstances." Neither are we able to locate any portion of the testimony which would justify an inference that Dr. Miller believed the job pressures were sufficient to cause "significant symptoms of distress" in a reasonable worker with training and experience [similar] to that of the claimant.

A division of this court affirmed the Panel in *Davison v. Industrial Claim Appeals Office,* 72 P.3d 389 (Colo.App.2003) (*Davison I* ), *reversed, Davison II, supra* (with Justice Kourlis dissenting).

Reversing *Davison I,* the supreme court concluded that § 8–41–301(2)(a) "does not categorically require a claimant to provide expert medical or psychological testimony to prove all elements of the second clause of the 'mental impairment' definition." *Davison II, supra,* 84 P.3d at 1028. The court then remanded the case "to the court of appeals with instructions to return [it] to the ICAO to *rehear* the claims, and for further proceedings consistent with this opinion." *Davison II, supra,* 84 P.3d at 1033 (emphasis added). In a footnote, the court observed:

We note that in . . . Davison's . . . case[ ], the claimant[ ] did introduce some evidence to prove the event was generally outside a worker's experience and would evoke significant symptoms of distress in a similarly situated worker. . . . Chief Tom Wagoner testified that the demands on

Captain Davison would have caused Wagoner to experience significant stress. *Davison II, supra,* 84 P.3d at 1032 n. 7.

Chief Wagoner did not testify that these demands were outside a worker's usual experience. Other than this cryptic footnote, the court did not cite any other evidence. In my view, there would have been little reason to remand the case for a further hearing if the court believed that there was substantial evidence in the record to support the ALJ's conclusions.

On remand, after the supreme court's reversal, there was no new evidentiary hearing. Instead, the ALJ determined: "[T]he findings, conclusions and order previously entered on December 20, 2001, are supported by the evidence in the record ... [and] thus, the ALJ's essential findings and conclusions remain unchanged ...."

Therefore, we now have a 2005 award of benefits based upon a 1998 and 1999 hearing, held when both parties were obviously under the impression that expert testimony was required to prove all aspects of a mental impairment claim under § 8–41–301(2)(a). In addition, the ALJ credited the testimony of Dr. Miller as supporting her findings and conclusions. However, based upon the Panel's 2002 conclusion that it could find nothing in Dr. Miller's testimony that would support the findings and the analysis in *Davison II,* it is apparent that Dr. Miller's testimony did not support the ALJ's findings and conclusions. Indeed, the supreme court determined that a new hearing should be held because the expert evidence, even though insufficient, was not required under § 8–41–301(2)(a). Thus, a new hearing contemplated that additional findings would be made based on other (and presumably new) competent evidence—not exclusively expert testimony.

In my review of the record, I could find no substantial evidence dealing with whether any particular event experienced by Captain Davison was a psychologically traumatic or whether the events in Captain Davison's worklife were outside the scope of his usual experiences and were so traumatic that they would create similar stress and depression in fellow workers. I found, however, testimony which showed the contrary.

Two experts testified in this matter. Neither was asked whether he could identify any specific event that was outside the usual experience of a police captain. Dr. Miller testified that Captain Davison's depression was "caused solely by [Captain Davison's] work" because he had "no other reasons to explain it." But Dr. Miller went on to describe the depression suffered here as having "started several years before" with "the kind of time course one would expect in a situation where pressures of any kind have gradually begun to wear somebody down and it just gets worse and worse until finally they [sic] can't bear it any longer."

Contrary to any suggestion that Dr. Miller identified a significant traumatic event that triggered Captain Davison's suicide which was outside the scope of pressures typically experienced, Dr. Miller opined that this depression was "very consistent with the kinds of pressures that a job with increased responsibilities, increased administrative duties in a growing police force *would be expected to have on such a person*" (emphasis added). Instead of tying Captain Davison's depression to any particular traumatic event, Dr. Miller said that "depressions rarely just sort of spring full blown, they build." He further acknowledged that Captain Davison's depression was one "that started four or five years earlier," and he quantified it as a "severe depression."

When asked whether he had identified a specific event that triggered the onset of Captain Davison's clinical depression, Dr. Miller acknowledged: "Not a specific event."

Dr. Vandenberg testified on behalf of employer and stated that he was not able to determine what precipitated Captain Davison's depression "before his suicide."

Because neither doctor was able to identify any particular traumatic event, it is understandable that neither was asked to opine whether any traumatic events were outside a policeman's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances.

I am unwilling to look into the penumbra of this record to find inferences and implications which would support a conclusion that

Dr. Miller's opinion was sufficient to meet the requirement that a psychologically traumatic event preceded Captain Davison's death. Unlike the replacement ALJ, I can find no expert or other testimony to support the finding that "this was not a case of an idiosyncratic response to a non-stressful or mildly stressful occurrence easily tolerated by others similarly situated."

Based upon the record, I am left to conclude, as did the first Panel, a division of this court, and by implication the Colorado Supreme Court, that there is no expert testimony which can establish the entire second clause of the mental impairment definition. However, there is in my view, expert testimony which disproves the existence of such a mental impairment.

The expert testimony also flatly contradicts any inferences that the majority seeks to draw from Chief Wagoner's testimony. Chief Wagoner testified that police work is generally stressful. Regarding the prostitution sting, the facts concerning which were divined from a cold record by an ALJ who did not hear the evidence, the Chief stated that "everybody in the department was kind of shocked and disappointed and under stress, yes, about that."

In fact, Chief Wagoner had ultimate responsibility for the prostitution sting and was the final arbiter of any discipline meted out by Captain Davison.

He further acknowledged that those who are responsible for managing the department all have stress in their jobs. In describing the responsibilities Captain Davison had in respect to the prostitution sting, he testified that when he determined to give Captain Davison disciplinary responsibility, he encouraged him to take some time off, play golf, and relax. Captain Davison in fact took time off, and Chief Wagoner took Davison and several others and their wives to dinner. He never suggested that this event was outside the usual experience of a police captain or that the event would have evoked suicidal ideation in other police captains.

Chief Wagoner told a local news reporter that he believed Captain Davison took his life, in part, because of the prostitution sting debacle, basing his opinion on a suicide note left by Captain Davison. Of course this lay opinion—if it is lay opinion—is difficult to extract from the record, and there is no direct testimony that the sting operation, which involved police who believed they were required to engage in a sexual act in order to document illegal activity, was the traumatic event that caused the suicide. Chief Wagoner's opinion is flatly contradicted by the expert testimony of Dr. Miller, perhaps explaining why it was not cited by the ALJ in her findings.

Captain Davison left a suicide note that also suggested there was no traumatic event, but it gives us some explanation for the time and place of his suicide. He described no particular event that he found to be traumatic, although he described "the weight of problem solving [he had] been involved with for the past 5 years." He stated, "[I] can no longer deal with the police dept. issues that have contributed significantly and are the cause, in my mind of my state of mind." In great detail, he told his family goodbye and specified how he wanted his funeral to be handled. Although he said that his "character [had been] destroyed by [his] own selfish acts," he described no particular event that led to his suicide.

It is clear from the note, however, that he contemplated the payment of death benefits. He wrote: "This act of taking my own life is job related.... The federal gov't should pay you money also as my death is job related on-duty.... If I stay I will have to quit the P.D. and that will be more painful for all. Your financial and well-being—health is more secure this way."

Nothing in the record lends substantial support to the findings that the personnel problems at the police department were extraordinary or that there were multiple psychologically traumatic events, let alone one single traumatic event, that would evoke significant symptoms of distress in similarly situated police captains. Instead, I believe we have been provided findings by an ALJ who carefully tailored her language to track the opinion in *Davison II.* She should have conducted another evidentiary hearing to determine the true course of events.

I would therefore set aside the Panel's award.